# Bawden v. Townes

United States District Court for the Southern District of New York

September 17, 2025, Decided; September 17, 2025, Filed

19-CV-8034 (ALC) (OTW)

**Reporter**
2025 U.S. Dist. LEXIS 182883 *; 2025 LX 410247

JENNIFER BAWDEN, Plaintiff, -against- DAVID K. TOWNES, Defendant.

**Prior History:** Doe v. Townes, 2020 U.S. Dist. LEXIS 83550, 2020 WL 2395159 (May 12, 2020)

**Counsel:** [*1] For Jennifer Bawden, Plaintiff: Danilo Bandovic, Derek Smith Law Group, New York, NY.

**Judges:** Ona T. Wang, United States Magistrate Judge.

**Opinion by:** Ona T. Wang

## Opinion

**REPORT AND RECOMMENDATION TO THE HONORABLE ANDREW L. CARTER, JR.**

**ONA T. WANG, United States Magistrate Judge**:

### I. INTRODUCTION

Plaintiff Jennifer Bawden ("Plaintiff") brought this action against Defendant David K.

Townes ("Defendant") alleging claims of, *inter alia*, breach of contract, fraud, discrimination, hostile work environment, retaliation, sexual assault, failure to pay minimum wage and overtime, and theft of electronic property. (*See* ECF 65).[1] The matter is before me for an inquest following the entry of a default against Defendant. (*See* ECF Nos. 113, 116, 117).

For the reasons below, I respectfully recommend that Plaintiff be awarded (1) **$750,000** in compensatory damages for discrimination, intentional infliction of emotional distress, and violations of the Victims of Gender Motivated Violence Protection Act; (2) **$750,000** in punitive damages for discrimination, intentional infliction of emotional distress, and violations of the Victims of Gender Motivated Violence Protection Act; (3) **$55,742.77** in compensatory damages for unpaid minimum [*2] wage and overtime damages; and (4) **$5,384.39** in compensatory damages for breach of contract, for a total of **$1,561,127.16 in damages**. Plaintiff should also be awarded costs in the amount of **$400**, and post-judgment interest.

### II. BACKGROUND

#### A. Factual History

In or around February 2016, Defendant, a New York investment banker, contacted Plaintiff to inquire about decorators to decorate his New York City apartment. (ECF 65 ¶¶ 29, 35). After helping Defendant with initial furniture ideas free of charge, in April of 2016, Defendant called Plaintiff and hired her to work for him, explaining she would be working and staying in the guest room of one of his five homes in Europe and North America. (*Id.* at ¶¶ 30-31). Plaintiff was offered a flat rate of $500 per day and was expected to work long hours on emergency projects, but she would not be required to work in certain instances where he was traveling. (*Id.* ¶¶ 32-33). When Plaintiff accepted the offer and moved into Defendant's guest room in New York City, she had already paid six months' advance rent for her townhouse in Florida and had $15,400 in payments remaining on her car lease. (*Id.* ¶¶ 34-36).

*1. Unpaid Wages*

---

[1] The original complaint, filed at ECF 1, was filed under the pseudonym "Jane Doe." (*See* ECF 1). On October 6, 2020, given that the preliminary injunction enjoining Defendant from "[r]evealing Plaintiff's name to the media or any third party, other than Defendant's attorney" had been removed, and having denied Plaintiff's motion to continue proceedings anonymously, (*see* ECF 44), I directed Plaintiff to amend the case caption to reflect her name. (*See* ECF Nos. 11, 64). Plaintiff re-filed the complaint at ECF 65 with the correct caption. (*See* ECF Nos. 65, 66).

Over the course of the next [*3] several years, Defendant routinely refused to pay Plaintiff for the work she performed. (*Id.* ¶¶ 38-50). On April 16, 2016, Defendant promised to pay Plaintiff $1,791.00, for the hours she had worked since starting, but Plaintiff never received this payment. (*Id.* ¶ 39). Plaintiff was not paid until May 12, 2016, when she received $5,833.09 for her hours worked between April 9, 2016, and May 5, 2016. (*Id.* ¶ 40). For the next two years, Defendant did not pay Plaintiff for her hours worked. (*Id.* ¶ 40).

In May of 2016, Defendant offered Plaintiff a deal where she receive an hourly rate of $62,[2] to decorate his apartment, (*see* ECF Nos. 65 ¶ 43, 130 ¶ 11); (*see also* ECF 131-1 ¶ 9), and she would receive a 50/50 ownership split of any furniture, art, or other "smaller chattel" if she would wait for payment instead of receiving immediate commission. (ECF 65 ¶ 43). Under the terms of the offer, if Plaintiff ever stopped working for Defendant, he would buy back certain pieces at double their cost or let Plaintiff keep half of the furniture. (*Id.*). Plaintiff accepted this offer, and Defendant promised that, "if and when he passed away, his fifty percent (50%) ownership would be Plaintiff's." (*Id.* [*4] ¶ 44).[3]

In the Fall of 2016, Defendant promised to pay Plaintiff for all the time logged on her second time tracker in the summer and early fall of 2016, totaling $17,755.62, with interest as a late fee. (*Id.* ¶ 45). He also advised Plaintiff that future earnings for her work would need to wait until his divorce proceedings were finalized or until he received a large bonus from his firm. (*Id.* ¶ 46). Based on these assertions, Plaintiff continued to work for Defendant. (*Id.* ¶ 49). In the Fall of 2016, Defendant asked Plaintiff to work as a paralegal on his divorce proceedings at her normal hourly rate plus a ten- to fifteen-percent bonus of his share of the marital estate, which she accepted. (*Id.* ¶ 50). At one point, due to a toxic work environment, Plaintiff told Defendant she would no longer work for him, but he pleaded with her to continue working for him, to which Plaintiff agreed that she would return if they changed the structure of her payment terms to include a minimum guarantee of $100,000. (*Id.* ¶¶ 51-52). Defendant agreed to the terms. (*Id.* ¶ 52).[4]

Plaintiff then kept track of her hours and made requests for Defendant to pay her in November and December of 2016, and January, February, [*5] March, and April of 2017, but Defendant did not pay Plaintiff for her work. (*Id.* ¶¶ 54-57). Then, in April of 2017, after a particularly abusive workday where Defendant screamed at Plaintiff, she continued to work for Defendant on reduced hours, again acting in reliance on his initial promises to pay her. (*Id.* ¶¶ 57-60). In January 2018, Plaintiff learned that Defendant received his bonus from work, but he did not pay her as he had repeatedly promised, so she sent another demand for payment. (*Id.* ¶¶ 61, 63).

In March 2018, Defendant told Plaintiff she needed to relocate because he was moving to a smaller apartment, and when confronted by Plaintiff about her overdue payments, he said he wanted to find a fair resolution for the amount owed. (*Id.* ¶¶ 64-66). Defendant also took a number of Plaintiff's personal items, which Plaintiff eventually allowed Defendant to keep on "loan" until he died or left the city. (*Id.* ¶¶ 67-69). Defendant continued to refuse to pay Plaintiff for the hours she worked between April 2016 and April 2018. (*Id.* ¶¶ 72-74).[5]

### 2. Sexual Assault

Throughout her time working for Defendant, Plaintiff "was subjected to dozens of incidents involving a hostile work environment [*6] based on her sex including unwelcome touching, groping, and sexual assault." (*Id.* ¶ 75). Defendant's harassment of Plaintiff began when she started working for Defendant; during the first few months, Defendant expressed romantic interest in Plaintiff and sought out a sexual relationship, asking if she would have a child with him. (*Id.* ¶ 98). Plaintiff strongly rebuked Defendant. (*Id.*). Defendant would also speak to Plaintiff about his sexual abilities and the size of his genitalia, and would often speak about his personal fetishes. (*Id.* ¶¶ 101-106).

---

[2] Plaintiff does not plead that Defendant offered Plaintiff a $62.50 hourly rate, and instead pleads that Defendant offered, and Plaintiff accepted, a rate of $500 per day. The characterization of $62.50 per hour is raised for the first time in Plaintiff's inquest briefing. However, assuming Plaintiff worked a standard work week of 8 hours a day for 5 days, the effective hourly rate would be $62.50. (($500 x 5 days) / 40 hours = $62.50).

[3] None of Plaintiff's claims involve the furniture involved in these subsequent negotiations.

[4] None of Plaintiff's claims involve the supposed $100,000 "minimum guarantee."

[5] At certain points, Defendant also directed Plaintiff to pay for expenses with her personal credit card, leaving her with thousands of dollars of expenses that he did not reimburse.

In sum, Defendant forcefully touched Plaintiff's buttocks, breasts, and vagina on numerous occasions without consent. (*Id.* ¶ 76). At an event in October of 2016, Defendant forcefully groped and twisted Plaintiff's breasts, squeezing so hard that Plaintiff had residual pain for days. (*Id.* ¶¶ 80-88). Plaintiff protested and told Defendant to stop and to never do such a thing again. (*Id.* ¶¶ 82-87). In April of 2017, after arriving back at the apartment after a musical event, Plaintiff went to sit next to Defendant on a couch when Defendant placed his outstretched hand underneath her and grabbed Plaintiff's buttocks beneath her dress. (*Id.* ¶¶ **[*7]** 90-92). Defendant then aggressively grabbed Plaintiff's vagina. (*Id.* ¶ 93). While leaving with Plaintiff to go to an art exhibit in June 2017, Defendant again grabbed and twisted Plaintiff's breasts. (*Id.* ¶¶ 109-110).

Because of Defendant's persistent and routine sexual assault, Plaintiff purchased a separate lock for her bedroom door and would barricade herself inside. (*Id.* ¶¶ 119-123). Defendant, on the other hand, would keep his bedroom door open so that he could hear when Plaintiff was moving around in the apartment. (*Id.* ¶ 126-127). To avoid Defendant, Plaintiff purchased a separate refrigerator, coffee maker, microwave, and water filter for her room, just so she would not have to endure Defendant's sexual assault in her own home. (*Id.* ¶¶ 127-129). Defendant then, without Plaintiff's knowledge, moved his bed into Plaintiff's bedroom, announcing that "he would be sleeping next to her in her room from now on." (*Id.* ¶ 130). Plaintiff moved Defendant's bed back into his room, but he continued to physically assault her in the apartment and expose himself. (*Id.* ¶¶ 138-152). Defendant continued to harass Plaintiff, bragging about his sexual prowess and his self-proclaimed virility of **[*8]** a 25-year-old man.[6] Similar advances and inappropriate behavior towards other assistants employed by Defendant led to multiple complaints and several staff members quitting their jobs. (*Id.* ¶¶ 154-160).

### 3. Defendant Continues to Harass Plaintiff After She Leaves the Apartment

In June of 2018, Plaintiff moved out of Defendant's apartment. (*Id.* ¶ 161). Ahead of her departure, Plaintiff requested payment for the hours of work she had tracked, and Defendant became increasingly hostile. (*Id.* ¶¶ 164-165). Defendant began to blackmail, harass, and threaten Plaintiff's life, and began to steal Plaintiff's and her son's possessions. (*Id.* ¶¶ 168-170). After continuously refusing to return her belongings, Defendant subjected Plaintiff to "extreme emotional and mental abuse to stop her from attempting to collect or pursue her back-owed salary or promised bonuses." (*Id.* ¶¶ 172-174). Specifically, Defendant "refused to return [Plaintiff's] items unless Plaintiff would agree in writing to forfeit all her legal rights to collect the money he owed her from her hours worked." (*Id.* ¶ 173). Defendant's emotional abuse escalated and forced Plaintiff to call 911 on at least two occasions. (*Id.* ¶¶ 179). However, **[*9]** Defendant's torment and threats did not stop. (*Id.* ¶¶ 192-217). Defendant screamed at Plaintiff on numerous occasions, saying that she would not survive a court case against him, that he would ruin her chances of ever working again, that he would destroy her reputation, and even restraining her by her wrists and saying "he would hit Plaintiff many times harder if she reported anything to the police or took legal action against him." (*Id.* ¶¶ 183-190). Defendant also stole Plaintiff's personal computer and extracted from it her personal contacts "to use as collateral," threatening to use the list to ruin her reputation. (*Id.* ¶¶ 197, 200). Defendant even went so far as to explicitly say:

> I am reiterating what will happen if I am subjected to any legal hostilities [...] I copied about twenty pages of hundreds of contact details for almost everyone in [Plaintiff's] life [...] I now have multiple copies of this data [...] If I am attacked in a legal process, I will send out to many parties the simple truth about [Plaintiff] which utterly contradicts the image she so assiduously puts forth. Many people, including me, love [Plaintiff's] positive qualities, but that will not stop me from retaliating **[*10]** if she attacks me with a lawsuit.

(*Id.* ¶ 207). Defendant then threatened to report Plaintiff to the IRS for failing to report the cost of his guest room as part of her pay. (*Id.* ¶ 221).

### B. Procedural History

Plaintiff commenced this action on August 28, 2019, and requested a temporary restraining order against Defendant with an order to show cause. (ECF 1). On August 29, 2019, Judge Carter ordered Defendant to

---

[6] For instance, Defendant said: "If you'd like to come in any time and try my very big penis, you are welcome to come in," "Women all say that I'm a tiger in bed, and I have a huge, strong penis," and" I am more virile than any of those young guys you've been with! Feel free to come into my room any time to find out for yourself." (ECF 65 ¶¶ 142-146).

show cause why an order should not be issued under Rule 65 enjoining Defendant from engaging in certain conduct subject to a temporary restraining order. (*See* ECF 4). Judge Carter granted Plaintiff's request for a preliminary injunction on September 20, 2019. (ECF 11).

Plaintiff filed a motion on October 21, 2019, to hold Defendant in civil contempt for violating the temporary restraining order. (*See* ECF 17). On October 25, 2019, Defendant filed an application for the Court to request counsel under 18 U.S.C. § 3006A, which Judge Carter denied on November 6, 2019. (*See* ECF Nos. 19, 23). Defendant filed his opposition on October 25, 2019, and Plaintiff filed her reply on the same day. (*See* ECF Nos. 21, 22). This case was then referred to me for general pretrial management and Plaintiff's motion for contempt. **[*11]** (*See* ECF 27).

I held an initial case management conference on March 4, 2020, (*see* ECF 29), and conducted an evidentiary hearing on Plaintiff's motion for contempt on the same day. (*See* ECF Nos. 31, 35). After the conference, I directed Plaintiff to serve Defendant with a copy of the transcript of the March 4 conference, as well as certain exhibits that were not included in her motion for civil contempt. (ECF Nos. 38, 39, 41, 42). On July 21, 2020, I issued a report and recommendation ("R&R") to Judge Carter that recommended denying Plaintiff's motion for civil contempt. (ECF 52). Judge Carter adopted my R&R on October 5, 2020. (ECF 63). I then entered a case management plan on December 2, 2020. (ECF 77).

After multiple instances where Defendant refused to engage in the discovery process, (*see* ECF 78, 79, 81), Plaintiff moved to strike Defendant's answer and for sanctions on March 17, 2021. (ECF 84). On April 8, 2021, I ordered Defendant to show cause in writing by April 22, 2021, why I should not recommend granting Plaintiff's motion to strike Defendant's answer for failure to comply with Rule 16(a) and Rule 26(a)(1). (*See* ECF 89). Defendant failed to respond to my order to show cause, (*see* Docket), so on **[*12]** September 30, 2021, I issued a R&R to Judge Carter recommending that he strike Defendant's answer and that Plaintiff be directed to file a motion for default within 30 days. (*See* ECF 95). Judge Carter adopted my September 30 R&R in full. (ECF 99).

Plaintiff obtained a clerk's certificate of default as to Defendant on April 25, 2022, and filed a motion for default on May 23, 2022. (ECF Nos. 107, 110, 111, 112). Judge Carter ordered Defendant to show cause why default judgment should not be entered pursuant to Fed. Rs. Civ. P. 37 and 55 for failure to move or otherwise answer Plaintiff's complaint. (ECF 113). Upon Defendant's failure to respond to Judge Carter's OSC, (*see* Docket), Judge Carter entered default judgment against Defendant on March 2, 2023. (ECF 117). Also on March 2, 2023, Judge Carter issued an amended referral order, referring this case to me for an inquest on damages. (ECF 116).

I ordered Plaintiff to file her proposed findings of fact and conclusions of law by May 3, 2023, with Defendant's opposition due by June 2, 2023. (ECF 120). Plaintiff filed her inquest submissions, after several extensions, on August 10, 2023. (*See* ECF Nos. 129, 130, 131). Defendant did not file an opposition. (*See* **[*13]** Docket).

III. DISCUSSION

A. Legal Standards

1. Determining Liability

A defendant's default is deemed "a concession of all well-pleaded allegations of liability," *Rovio Entm't, Ltd. v. Allstar Vending, Inc.*, 97 F. Supp. 3d 536, 545 (S.D.N.Y. 2015), but "[a] default only establishes a defendant's liability if those allegations are sufficient to state a cause of action against the defendants." *Gesualdi v. Quadrozzi Equip. Leasing Corp.*, 629 F. App'x 111, 113 (2d Cir. 2015) (summary order). Thus, a Court "must determine whether the allegations in the complaint establish the defendants' liability as a matter of law." *Nguyen v. Pho Vietnam 87 Corp.*, 23-CV-4298 (JLR) (VF), 2025 U.S. Dist. LEXIS 24734, 2025 WL 564546, at *3 (S.D.N.Y. Jan. 31, 2025) (internal quotations omitted), *report and recommendation adopted by* 2025 U.S. Dist. LEXIS 30183, 2025 WL 562763 (S.D.N.Y. Feb. 19, 2025). If the Court finds a complaint fails to state a claim on which relief may be granted, the Court may not award damages notwithstanding the default. *Id.* (citing *Lopez v. Emerald Staffing, Inc.*, 18-CV-2788 (SLC), 2020 U.S. Dist. LEXIS 33232, 2020 WL 915821, at *4 (S.D.N.Y. Feb. 26, 2020)).

2. Determining Damages

Even though a complaint's factual allegations are

Case 1:25-cv-01675-VSB-VF   Document 84-1   Filed 10/01/25   Page 5 of 18

Page 5 of 18
2025 U.S. Dist. LEXIS 182883, *13

presumed true in the event of a default, damages allegations are not entitled to the same presumption. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). The plaintiff "bears the burden of establishing [their] entitlement to recovery," *Lopez*, 2020 WL 915821 at *4, and must supply an evidentiary basis for the specific damages amount sought. *Santana v. Latino Express Restaurants, Inc.*, 198 F. Supp. 3d 285, 292 (S.D.N.Y. Jul. 28, 2016). Evidence submitted by the plaintiff must also be admissible. *Poulos v. City of New York*, 14-CV-3023 (LTS) (BCM), 2018 WL 3750508, at *2 (S.D.N.Y. July 13, 2018), *report and recommendation adopted by* 2018 U.S. Dist. LEXIS 132179, 2018 WL 3745661 (S.D.N.Y. Aug. 6, 2018).

An inquest into damages may be conducted without an evidentiary hearing. *See* [*14] *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53-54 (2d Cir. 1993). "[A] hearing is not required where a sufficient basis on which to make a calculation exists." *Maldonado v. La Nueva Rampa, Inc.*, 10-CV-8195 (LLS) (JLC), 2012 U.S. Dist. LEXIS 67058, 2012 WL 1669341, at *2 (S.D.N.Y. May 14, 2012). In this case, no hearing was requested or held, as the damages awarded can be ascertained "with reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999).

"Ultimately, the default judgment the Court enters must not differ in kind from, or exceed in amount, what is demanded in the pleadings. *Nguyen*, 2025 WL 564546 at *3.

**B. Liability**[7]

*1. Jurisdiction and Venue*

This Court has proper subject-matter jurisdiction over this case. The Court has federal question jurisdiction under 18 U.S.C. § 1331, as Plaintiff brings claims under the Stored Communications Act ("SCA"), 18 U.S.C. § 2511, the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2701(a), and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 200 *et seq*. Under 28 U.S.C. § 1367(a), the Court also has supplemental jurisdiction over Plaintiff's state law claims, which she brings pursuant to, *inter alia*, the New York City Human Rights Law ("NYCHRL"), New York Labor Law ("NYLL"), and state contract and tort laws.

The Court may also exercise personal jurisdiction over Defendant. *See Pinzon v. 467 Star Deli Inc.*, 22-CV-6864 (JGK) (SLC), 2023 U.S. Dist. LEXIS 147682, 2023 WL 5337617, at *4 (S.D.N.Y. July 31, 2023), *report and recommendation adopted by* 2023 U.S. Dist. LEXIS 147681, 2023 WL 5334757 (S.D.N.Y. Aug. 18, 2023) ("Personal jurisdiction is 'a necessary prerequisite to entry of a default judgment.'"). The Court has personal jurisdiction over Defendant because Defendant lives in New York City and a substantial portion of the acts alleged took place in New York. Plaintiff also properly served Defendant with the summons and complaint. (*See* ECF 13).[8]

*2. The* [*15] *Wiretap Act,* 18 U.S.C. § 2511(1)(d)

Plaintiff's second cause of action alleges Defendant violated 18 U.S.C. §§ 2511(1)(c) and (d) by disclosing and using the contents of allegedly intercepted communications.

Under the Wiretap Act, it is unlawful to intentionally use or disclose, or endeavor to use or disclose "the contents of any wire, oral, or electronic communications, knowing

---

[7] Plaintiff states in her Findings of Fact and Conclusions of Law that she is withdrawing the following claims as duplicative: (1) violations of 18 U.S.C. 1030 (Count 1); (2) illegal deductions (Count 11); (3) spread of hours Compensation (Count 14); (4) recordkeeping violations (Count 15); (5) quantum meruit (Count 18); (6) unjust enrichment (Count 19); and (7) promissory estoppel (Count 20). (*See* ECF 130).

[8] Under Fed. R. Civ. P. 4(e)(1), service on an individual can be effected by "following state law for serving a summons . . . where the district court is located." Here, New York law permits service of an individual defendant by both delivering the summons and complaint to "a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served" and mailing the summons to the last known residence or place of business. N.Y. C.P.L.R. § 308(2). Here, Plaintiff submitted an affidavit of service stating that Defendant was served by delivering a copy of the summons and complaint to "Rod Doe," a doorman at Defendant's dwelling place or usual place of abode at 900 Park Avenue Apt. 23B, New York, NY 10075, and mailing a copy to Defendant at the same address by first class mail. (*See* ECF 13). Plaintiff also personally served Defendant on September 17, 2019, at 85 Willis Avenue Ste F. Mineola, NY 11501. (*See* ECF 14). Additionally, Plaintiff served Defendant a copy of Plaintiff's motion for default judgment at 900 Park Avenue by first class mail and by email. (*See* ECF Nos. 114, 115).

or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of Section 2511." *Zaratzian v. Abadir*, 10-CV-9049 (VB), 2014 U.S. Dist. LEXIS 129616, 2014 WL 4467919, at *5 (S.D.N.Y. Sept. 2, 2014). Courts in this district have held that the "interception" of a communication subject to the Wiretap Act must be "contemporaneous" with the transmission of the communication. *Id.*; *see also Snyder v. Fantasy Interactive, Inc.*, 11-CV-3593 (WHP), 2012 U.S. Dist. LEXIS 23087, 2012 WL 569185, at *2 (S.D.N.Y. Feb. 9, 2012).

Here, Plaintiff only pleads in conclusory fashion that Defendant "intercepted" Plaintiff's electronic communications by accessing her computer and emails stored therein without Plaintiff's consent. (*See* ECF 65 ¶¶ 248-250). However, unauthorized access to emails stored on a computer is not sufficient to constitute "interception" under § 2511. *See Snyder*, 2012 WL 569185 at *1-2 (holding unauthorized access to an individual's computer and their Skype accounts to read instant message conversations did not constitute access during their transmission under the Wiretap Act).

Accordingly, because Plaintiff fails **[*16]** to plead that Defendant "intercepted" her electronic communications, I find that Defendant is not liable under 18 U.S.C. §§ 2511(c) or 2511(d).

### 3. The Stored Communications Act, 18 U.S.C. § 2701(a)

Plaintiff's third cause of action alleges Defendant violated 18 U.S.C. § 2701(a) by accessing Plaintiff's e-mails and contact lists and other information stored on her personal computer.

"The [SCA] provides that it is both a criminal offence and a civil cause of action against anyone who: (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system...." *Seltzer v. Clark Assocs. LLC*, 20-CV-4685 (AKH), 2021 U.S. Dist. LEXIS 21604, 2021 WL 396633, at *1 (S.D.N.Y. Feb. 4, 2021) (quoting 18 U.S.C. § 2701(a)). A person thus violates the SCA if they (1) access an electronic communication service, or (2) obtain an electronic communication while it is in electronic storage, without authorization. *See Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 555 (S.D.N.Y. 2008). An e-mail that is stored on a personal computer is not a "stored communication subject to the SCA." *Id.*; *c.f. Seltzer*, 2021 WL 396633 at *1 (finding unauthorized access to a "third-party ISP system[] without authorization" to access a plaintiff's e-mails constitutes a violation of the **[*17]** SCA).

Here, Plaintiff alleges in the complaint that Defendant accessed her computer without authorization, and that he "extracted from said computer Plaintiff's private rolodex," (*see* ECF 65 ¶ 9). Plaintiff pleads in conclusory faction that Defendant "thereby obtain[ed] access to wire or electronic communications while they were in electronic storage in such systems." (*Id.* ¶ 255). Plaintiff only alleges that Defendant accessed her personal e-mails to obtain her rolodex without her knowledge and consent for the first time in her proposed findings of fact and conclusions of law, (ECF 130 ¶¶ 59, 61), which "facts" the Court need not consider since they were not pleaded in the complaint. *See Campbell v. Bank of New York Mellon Trust Co., N.A.*, 11-CV-1588 (CS) (PED), 2012 U.S. Dist. LEXIS 100595, 2012 WL 2952852, at *15 (S.D.N.Y. May 8, 2012) ("Not only does the Complaint fail to identify these legal theories, but it also fails to set forth factual allegations that would support such claims. Because it is the complaint, not the inquest submissions, that establishes defendants' liability, the Court may not award damages on these claims.") (internal quotations omitted)). Even so, Plaintiff fails to plead whether such e-mails were stored on Plaintiff's personal computer itself, or whether Defendant instead accessed Plaintiff's online e-mail **[*18]** accounts—i.e., stored in an "electronic communication service provider's systems after it has been delivered." *See Pure Power Boot Camp*, 587 F. Supp. 2d at 555.

Accordingly, I find Plaintiff failed to adequately plead, and Defendant is not liable for, violation of § 2701(a) of the SCA.

### 4. Discrimination and Retaliation

#### a. Discrimination

Plaintiff's fourth cause of action alleges Defendant discriminated against her on the basis of her sex and/or gender and created a hostile work environment by sexually harassing her and maintaining discriminatory

working conditions in violation of New York State Human Rights Law ("NYSHRL") § 296 and NYCHRL § 8-107(1).

Under the NYSHRL, a plaintiff must show she was subjected to "inferior terms, conditions or privileges of employment because of the individual's membership in one or more of the protected categories." *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 453 (S.D.N.Y. 2024). Similarly, the NYCHRL requires a plaintiff to show she was "subjected to unwanted gender-based conduct," which can be shown by demonstrating "she has been treated less well than other employees because of her gender." *Id.* (internal quotations omitted). Discriminatory motive can be shown by pleading direct evidence of discrimination, such as comments "indicating prejudice on account of a protected characteristic" or those that refer to "demeaning stereotypes." *Id.*

Plaintiff's [*19] factual allegations here are more than sufficient to establish that Defendant discriminated against her and subjected her to a hostile work environment on the basis of her gender. Plaintiff belongs to a protected group as a woman. Plaintiff also was subjected to constant physical and verbal abuse by Defendant on the basis of her gender, including physically grabbing Plaintiff's breasts, thighs, buttocks, and vagina, and boasting about his genitalia and attempting to goad Plaintiff into having sex with him. (*See, e.g.*, ECF 65 ¶¶ 139-150). Taken together, it is clear that Defendant's consistent physical and verbal abuse of Plaintiff reflects a discriminatory motive and constitutes discrimination on the basis of her gender.

Accordingly, I find Defendant liable for discrimination on the basis of sex and/or gender under NYSHRL § 296 and NYCHRL § 8-107(1).

### b. Retaliation[9]

Plaintiff alleges that Defendant retaliated against her because of her opposition to his "unlawful practices" in violation of NYSHRL § 296(7) and NYCHRL § 8-107(7).[10]

Under the NYSHRL, it is "unlawful for an employer to retaliate or discriminate against an employee because she has opposed any practices forbidden under this article or because she has filed a complaint, testified or assisted [*20] in any proceeding under this article." *Acosta v. Kennedy Child.'s Ctr.*, 24-CV-3358 (PAE), 2025 U.S. Dist. LEXIS 6564, 2025 WL 70141, at *9 (S.D.N.Y. Jan. 10, 2025). "To establish a prima facie case of retaliation under the NYSHRL, ... a plaintiff-employee must show that (1) she engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the protected activity and the adverse action." *Id.* (quoting *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361-62 (S.D.N.Y. 2012)). "A plaintiff claiming retaliation must demonstrate that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Puris v. TikTok Inc.*, 24-CV-944 (DLC), 2025 U.S. Dist. LEXIS 16998, 2025 WL 343905, at *8 (S.D.N.Y. Jan. 30, 2025). The plaintiff's burden of proof at the *prima facie* stage is "*de minimis*." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

A protected activity is an "action taken to protest or oppose statutorily prohibited discrimination." *Wright v. Monroe Cmt. Hosp.*, 493 F. App'x 233, 236 (2d Cir. 2012). "When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015). To establish a causal connection, a plaintiff must show the protected activity was a "substantial motivating factor in the adverse action." *Kiernan v. Town of Southampton*, 734 F. App'x 37, 42 (2d Cir. 2018). Causation [*21] requires a showing that "the adverse action would not have occurred in the absence of the retaliatory motive." *Duplan v. City of N.Y.*, 888 F.3d 612, 625 (2d Cir. 2018).

Here, Plaintiff fails to plead the elements of a retaliation claim under the NYSHRL. While Plaintiff does adequately allege that she engaged in protected activity by "complain[ing] about sexual harassment, a hostile work environment, discrimination, and retaliation on the

---

[9] Plaintiff's findings of fact and conclusions of law include, for the first time, an argument that Defendant is also liable for retaliation under New York Labor Law § 215(1). Because this claim was not pleaded in Plaintiff's complaint, the Court cannot assess and determine Defendant's liability or award damages on this claim. *See Campbell*, 2012 WL 2952852 at *15.

[10] Plaintiff erroneously cites to § 8-107(1)(e).

basis of her sex/gender," (*see* ECF 130 ¶ 77), she fails to plead that Defendant took an adverse action against her that was caused by this particular activity. In her complaint, Plaintiff alleges that Defendant retaliated against her for seeking fair compensation: "[a]fter repeated requests to be compensated for her work, Defendant TOWNES instituted a shocking pattern and practice of using everything at his disposal to terrorize and frighten Plaintiff so she would walk away." (ECF 65 ¶ 168).[11] At no point, however, does Plaintiff allege that the retaliatory actions taken by Defendant were in any way motivated by her complaints related to gender discrimination. Further, Defendant's ongoing sexual harassment and assault of Plaintiff cannot be construed as retaliatory, as nothing suggests that absent Plaintiff's **[*22]** complaints, Defendant would not have sexually assaulted her—Defendant's sexual assaults pre-date Plaintiff's complaints, and Plaintiff does not plead that Defendant's sexual assaults changed in any way after her protests.

While the standards for retaliation under the NYCHRL are as broad, if not broader, than those under the NYSHRL, *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 268 (S.D.N.Y. 2020), Plaintiff's claims fail for the same reasons described above. "The elements of a *prima facie* case of retaliation under the NYCHRL" are identical to those under the NYSHRL and Title VII, except that the NYCHRL only requires a showing that "something happened that would be reasonably likely to deter a person from engaging in protected activity," as opposed to an "adverse employment action." *Kulick v. Gordon Prop. Group, LLC*, 23-CV-9928 (KPF), 2025 U.S. Dist. LEXIS 22959, 2025 WL 448333, at *13 (S.D.N.Y. Feb. 7, 2025). Even under this more liberal standard, Plaintiff fails to plead that Defendant took any action in response to her complaints about gender discrimination that would have deterred her from engaging in a protected activity, and § 8-107(7) is not so broad that it provides protection for complaining about any illegal activity.[12]

---

[11] (*See also* ECF 65 ¶ 170) ("Defendant TOWNES threatened Plaintiff's life in order to ensure that Plaintiff did not pursue any legal claims to retrieve her wages, bonus, or her promised share of the furniture and art as part of their agreement.").

[12] NYCHRL § 8-107(7) prohibits retaliation against an employee for "oppos[ing] any practice forbidden under this chapter..." Forbidden practices under §§ 8-107 *et seq.* include unlawful discrimination on the basis of one's age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive

Accordingly, I find Plaintiff has not shown that Defendant is liable for retaliation under NYSHRL § 296(7) and NYCHRL § 8-107(7).

### 5. Interference under NYCHRL § 8-107(19)

NYCHRL § 8-107(19) provides:

> It shall be an unlawful **[*23]** discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of such person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

A plaintiff alleging a violation of § 8-107(19) must adequately allege a threat. *Cadet v. Alliance Nursing Staffing of New York, Inc.*, 632 F. Supp. 3d 202, 236 (S.D.N.Y. 2022). "A threat is the creation of an impression of impending injury." *Id.* (internal quotations omitted). While a threat need not imply physical violence, there must be some "affirmative threat beyond the adverse employment action itself." *Id.* at 237.

For the same reasons that Plaintiff fails to plead a claim for retaliation under the NYCHRL, Plaintiff fails to plead a claim for interference under § 8-107(19). Like § 8-107(7), § 8-107(19) prohibits a threat that prevents the enjoyment of a right "granted or protected pursuant to this section;" i.e., rights related to a protected class. Here, all of the threats pleaded in the complaint follow and are related to Plaintiff's requests to be fairly compensated for her work. (*See* ECF 65 ¶¶ 170, 173-74, 192). Threats related to such complaints are not cognizable under **[*24]** § 8-107(19). *See Roelcke v. Zip Aviation, LLC*, 15-CV-6284 (DAB), 2018 WL 1792374, at *9 (S.D.N.Y. 2018) ("Plaintiff allegedly complained to Shoshani in December 2009 that she would not return to New York because she would never be paid fairly for her work. This is not a protected complaint under the NYCHRL as it does not related to a protected class."). Plaintiff only raises for the first time in her inquest briefing that Defendant's threats may have been related to sexual harassment and assault, (ECF 130 ¶ 87), which the Court cannot assess as it was not pleaded in the complaint. *See Campbell*, 2012 WL 2952852 at *15.

---

health decisions, sexual orientation, uniformed service, height, weight, or immigration or citizenship status. § 8-107(1). These specific protections do not apply to labor violations.

Accordingly, I find that Defendant is not liable under § 8-107(19) for interference.

### 6. The Victims of Gender Motivated Violence Protection Act ("VGMVPA"), N.Y. ADC. Code §§ 8-903-905

"The Victims of Gender Motivated Violence Protection Act provides a cause of action based on crimes of violence motivated by gender, defined as a crime of violence committed because of ender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." Roelcke, 2018 WL 1792374, at *13. To state a claim under the VGMVPA, a plaintiff must show "(1) the alleged act constitutes a misdemeanor or felony against the plaintiff; (2) presenting a serious risk of physical injury; (3) that was perpetrated because of plaintiff's gender; (4) in part because of animus against plaintiff's gender; and (5) resulted in injury." Doe v. Olive Leaves, Inc., 18-CV-5734 (HG) (TAM), 2024 U.S. Dist. LEXIS 29387, 2024 WL 3048373, at *11 (E.D.N.Y. Feb. 16, 2024) (quoting **[*25]** Hughes v. Twenty-First Century Fox, Inc., 304 F. Supp. 3d 429, 455 (S.D.N.Y. 2018)). "An act is 'motivated by gender' if it is 'committed because of gender or on the basis of gender and due, at least in part, to an animus based on the victim's gender.'" Hughes, 304 F. Supp. 3d at 455.

Here, Plaintiff has alleged an act that would constitute a misdemeanor or felony. See N.Y. Penal Law § 130.52 ("A person is guilty of forcible touching when such person intentionally, and for no legitimate purpose: 1. Forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person, or for the purpose of gratifying the actor's sexual desire...."); § 130.65 (defining as a class D felony sexual abuse in the first degree when a person "subjects another person to sexual contact[] ... [b]y forcible compulsion"). Sexual assault necessarily represents a serious risk of physical injury, and is sufficient on its own to plead animus based on the victim's gender. Olive Leaves, 2024 U.S. Dist. LEXIS 29387, 2024 WL 3048373, at *11. Plaintiff has also sufficiently alleged injury resulting from Defendant's sexual assault, including physical injury, (see, e.g., ECF 65 ¶ 76), as well as humiliation, emotional distress, depression, and anxiety. (ECF ¶ 227).

Accordingly, I find Defendant is liable under the VGMVPA.

### 7. Intentional Infliction of Emotional Distress ("IIED")

**[*26]** To state a claim for IIED, a plaintiff must allege (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. Dixon v. Reid, 744 F. supp. 3d 323, 329 (S.D.N.Y. 2024). Sexual assault is generally found to be extreme and outrageous conduct. Id. Claims under the VGMVPA are not necessarily duplicative of IIED claims. See Bensky v. Indyke, 743 F. Supp. 3d 586, 602 (S.D.N.Y. 2024) (holding IIED claims are not duplicative of claims under the VGMVPA because "an actor could commit a 'crime of violence motivated by gender' without intending to cause emotional distress").

Here, Plaintiff has adequately pleaded a claim for IIED. Defendant's numerous sexual assaults of Plaintiff constitute extreme and outrageous conduct and were committed with disregard as to the probability of causing Plaintiff severe emotional distress. Further, Plaintiff did experience severe emotional distress that was caused by Defendant's actions. Moreover, Defendant's explicit threats to ruin Plaintiff's reputation and future work prospects by attempting to blackmail her and threatening to reach out to all of her contacts if she initiated litigation to recover wages owed to her also constitute extreme and outrageous conduct with intent to cause emotional distress that did indeed cause Plaintiff emotional distress. **[*27]**

Accordingly, I find Defendant liable for IIED.

### 8. Failure to Pay Wages and Overtime under the FLSA and NYLL §§ 650 et seq.

#### a. Statute of Limitations

Under the NYLL, the statute of limitations is six years. N.Y. Labor Law § 663(3). The FLSA provides a two-year statute of limitations, unless the violations are "willful," in which case a three-year statute of limitations applies. 29 U.S.C. § 255(a). "Although a plaintiff may not recover under both the FLSA and the NYLL for the same injury, courts allow recovery under the statute that provides for the greatest relief." Nguyen, 2025 WL 564546 at *4. See also Hengjin Sun v. China 1221, Inc., 12-CV-7135 (RJS), 2016 U.S. Dist. LEXIS 52292, 2016 WL

1587242, at *2 (S.D.N.Y. Apr. 19, 2016) (holding courts may exercise discretion to elect statute that "provid[es] the greatest amount of relief.").

Plaintiff's claims under the FLSA and NYLL relate to her work for Defendant between April 2016 and April 2018. Plaintiff filed her complaint on August 28, 2019. Because Plaintiff's employment period is entirely within the NYLL's six-year statute of limitations, the Court will analyze Plaintiff's claims solely under the NYLL as this will provide Plaintiff the most relief.

### b. NYLL Liability

To state a claim for wages under the NYLL, a plaintiff must allege that (1) she was the defendant's employee and (2) she worked for hours for which he did not receive minimum and/or overtime [*28] wages. Tackie v. Keff Enters. LLC, 14-CV-2074 (JPO), 2014 U.S. Dist. LEXIS 130148, 2014 WL 4626229, at *2 (S.D.N.Y. Sept. 16, 2014).[13] Recovery for unpaid overtime requires a plaintiff to "allege sufficient factual matter to state a plausible claim that they worked compensable overtime in a workweek longer than 40 hours." Lundy v. Cath. Health Sys. Of Long Island Inc., 711 F.3d 106, 114 (2d Cir. 2013).

### i. The Employment Relationship

Courts in this district routinely apply the same test under the FLSA and the NYLL to determine whether a defendant was a plaintiff's "employer." See Martin v. Sprint United Mgmt. Co., 273 F. Supp. 3d 404, 422 (S.D.N.Y. 2017). An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Whether one can be considered an employer looks at the degree of "formal control" or "functional control" over the plaintiff. Barfield v. New York City Health and Hospitals Corp., 537 F.3d 132, 143 (2d Cir. 2008). Courts in this circuit consider four factors under a totality-of-the-circumstances approach to assess an alleged employment relationship, including whether the alleged employer: (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. Irizarry v. Catsimatidis, 722 F.3d 99, 104 (2d Cir. 2013); Tackie, 2014 U.S. Dist. LEXIS 130148, 2014 WL 4626229, at *2.

Plaintiff has sufficiently alleged that Defendant is an "employer" liable under the NYLL. Plaintiff alleges that Defendant hired her in April of 2016 to work for him. (ECF [*29] 65 ¶ 31). Defendant also set Plaintiff's rate of payment and controlled the method of payment. Considering the totality of the circumstances, Plaintiff sufficiently alleges that Defendant had and exercised "functional control" over Plaintiff to establish an employer-employee relationship with Defendant.

### ii. Unpaid Minimum Wage and Overtime Wages

The applicable minimum wage during the relevant time periods ranged from $9.00 to $12.00 per hour. See NYLL § 652.[14]

To determine Plaintiff's regular rate of pay, the court must divide the employee's total weekly earnings by the lesser of 40 hours or the actual number of hours worked during the work week. Nguyen, 2025 WL 564546 at *8. Hours worked over eight in a day or forty in a week are considered premium pay and are excluded from the calculation of regular hourly rate of pay. 12 N.Y.C.R.R. § 146-3.5(b).

While Plaintiff and Defendant agreed that Plaintiff would be paid a flat rate of $500 per day for her work, Defendant paid Plaintiff a lump sum of $5,833.09 that supposedly applied to work performed between April 9, 2016, and May 5, 2016. (ECF 65 ¶ 40). These dates stretch across five different pay periods, and do not completely cover all days worked during these pay

---

[13] Courts in this district apply the same analysis for the FLSA and the NYLL, except that the NYLL, unlike the FLSA, does not require a showing of a "nexus with interstate commerce or a minimum amount of annual sales." Nguyen, 2025 U.S. Dist. LEXIS 24734, 2025 WL 564546, at *4.

[14] Under NYLL § 652, minimum wage in New York for all employers was $9.00 per hour between December 31, 2015, and December 31, 2016. Thereafter, different minimum wage rates were set for large employers (having eleven or more employees) and small employers (having ten or fewer employees). Here, because the complaint only pleads that Defendant hired Plaintiff to decorate his apartment, the Court assumes for these purposes that Defendant was a small employer. For small employers, the minimum wage was $10.50 per hour between December 31, 2016, and December 31, 2017, and $12.00 per hour between December 31, 2017, and December 31, 2018. See § 652.

periods: (1) April 1, 2016-April 10, **[*30]** 2016; (2) April 11, 2016-April 17, 2016; (3) April 18, 2016-April 24, 2016; (4) April 25, 2016-May 1, 2016; and (5) May 2, 2016-May 8, 2016. In order to calculate Plaintiff's regular rate of pay during each of these pay periods, the Court divides the lump sum payment ($5,833.09) by the number of days actually worked that the payment supposedly applies to (26), for a total of $224.35 per day.[15] This amount is then applied to each workday "covered" by the lump sum payment in each respective pay period to determine total pay per applicable pay period:

[Go to table1]

Then, the Court divides the total amount paid across each pay period by the lesser of either 40 hours or the total hours worked during the pay period. Plaintiff's calculated regular rate of pay compared to the applicable minimum wage is summarized as follows:

[Go to table2]

Accordingly, Plaintiff's wages during the first five pay periods were greater than the prevailing minimum wage in New York, and Defendant is not liable to Plaintiff for failure to pay minimum wage during these pay periods.

Plaintiff did not receive any additional payments for her work performed between May 5, 2016, and March 5, 2018.[18] Accepting Plaintiff's allegations as true, Plaintiff alleged that her calculated regular rate of pay was necessarily less than the prevailing minimum wage in New York between May 5, 2016, and March 5, 2018.

The NYLL also requires an employer to pay an overtime rate of one-and-one-half times the employee's regular rate of pay. 12 N.Y.C.R.R. § 142-2.2. A plaintiff need only allege that they worked "compensable overtime in a workweek longer than forty hours, and that [they] were not properly compensated for that overtime." *Nguyen, 2025 WL 564546 at *8*. Plaintiff alleges that she regularly worked in excess of 40 hours and that Defendant did not pay her any wages (excluding the five pay periods discussed above), let alone overtime wages. (*See generally* ECF 65). These allegations are sufficient to establish liability. *See Galindo v. Yummy Foods Deli Corp., 21-CV-45 (JGLC) (SLC), 2024 U.S. Dist. LEXIS 8792, 2024 WL 947283, at *10 (S.D.N.Y. Jan. 17, 2024)*, report and recommendation adopted by **[*32]** 2024 U.S. Dist. LEXIS 23293, 2024 WL 515245 (S.D.N.Y. Feb. 9, 2024).

Accordingly, Plaintiff has sufficiently established Defendant's liability under NYLL for unpaid minimum wage between May 5, 2016, and March 5, 2016, and unpaid overtime wages.

### 9. Liquidated Damages

Plaintiff's claim for liquidated damages only appears once in the complaint under Plaintiff's fifteenth cause of action for violations of the notice and recordkeeping requirements under NYLL § 661. (ECF 65 ¶ 316). Plaintiff raises arguments with respect to liquidated damages as to Defendant's failure to pay wages and overtime for the first time in their inquest briefing, (*see* ECF 129, 130), which the Court need not consider since they were not pleaded in the complaint. *See Campbell, 2012 U.S. Dist. LEXIS 100595, 2012 WL 2952852, at *15*. Moreover, Plaintiff's inquest briefing voluntarily waived their recordkeeping claims. (*See* ECF 130 at 10 n. 1).

Accordingly, I find Plaintiff has withdrawn the only claim in which she pleaded liquidated damages, and thus is not entitled to them.

### 10. Breach of Contract

The elements for a breach of contract claim are: (1) the existence of a contract; (2) performance of the contract by one party; (3) breach of the contract by the other party; and (4) damages. *Terwilliger v. Terwilliger, 206 F.3d 240, 246 (2d Cir. 2000); Kolmar Americas Inc. v. Mycone Dental Supply Co. Inc., 21-CV-2361 (CM), 2021 U.S. Dist. LEXIS 211923, 2021 WL 5054300, at *5 (S.D.N.Y. Nov. 1, 2021)*. A breach of contract claim requires a "meeting of the minds and a manifestation **[*33]** of mutual assent that is sufficiently definite to assure that the parties are truly in agreement with respect to all material terms as to form a binding, enforceable contract." *Kolmar, 2021 WL 5054300*. Where, as here, there is no written agreement between the parties, a plaintiff may still establish the existence of

---

[15] Because the parties originally agreed to a rate of $500 per day, which, as discussed above, generally calculates out to $62.50 per hour, the Court assumes that Defendant's lump sum payment was intended to apply equally across each of the days worked.

[18] While Plaintiff's pleadings state that she worked for Defendant until April 2018, her time sheets submitted as part of her inquest briefing only reflect work through March 5, 2018. (See ECF 131-9). The Court will use this date to determine liability and damages.

a contract "through the words and/or conduct of the parties, that a contract was made and that its terms are definite." Zurich Ins. Grp. v. Grandurismo, Inc., 00-CV-980, 2000 U.S. Dist. LEXIS 16155, 2000 WL 1677941, at *3 (S.D.N.Y. Nov. 8, 2000).

Here, Defendant offered Plaintiff a job working for him as a decorator at a rate of $500 per day and asked her to fly to New York to start working. (ECF 65 ¶¶ 29-32). Plaintiff, relying on that promise, flew to New York and began to work for Defendant. (*Id.* ¶¶ 34-37). This is sufficient to establish a binding, enforceable contract.[19] *See* Spithogianis v. Haj-Darwish, 07-CV-4609 (PAC) (JCF), 2008 U.S. Dist. LEXIS 824, 2008 WL 82188, at *4 (S.D.N.Y. Jan. 7, 2008) (holding a promise to borrow a sum of money and loan it for the purposes of financing production of fast food units was sufficient to survive dismissal notwithstanding the lack of a written agreement). Plaintiff began working for Defendant in April 2016. (ECF 65 ¶¶ 38). Despite working for Defendant as contemplated under the parties Defendant thereafter repeatedly failed and/or refused to pay Plaintiff for her work. (*See, e.g., Id.* ¶¶ 40, 42, [*34] 45, 57). Accordingly, Plaintiff has sufficiently pleaded breach of contract for failure to pay wages.[20]

Plaintiff also includes in her inquest briefing, for the first time, allegations that Defendant is liable for breach of contract for failing to reimburse her for relocation costs and her car lease in Florida. (*See* ECF 129 at 25) (citing ECF 65 at 34). However, the provision of the complaint to which Plaintiff cites only states: "Plaintiff, living in Florida at the time, abandoned her townhouse and the new three-year lease on her car and quickly relocated to New York City. Plaintiff moved in to the guest room at Defendant TOWNES' apartment to work for him per his request." (ECF 65 ¶ 34). Nowhere in this paragraph or anywhere else in the complaint does Plaintiff allege that Defendant asked Plaintiff to break her car lease or promised to reimburse her for relocation costs as a condition of her employment. There is also no indication that Defendant had any reason to know or should have known that Plaintiff would abandon her townhouse and break the lease on her car to accept the position. Accordingly, Plaintiff did not properly plead damages for relocation costs and her car [*35] lease.

### 11. Fraud

To state a claim for common law fraud in New York, a plaintiff must plead: (1) the defendant made a representation as to a material fact; (2) the representation was false; (3) the defendant intended to deceive the plaintiff; (4) the plaintiff relied upon the representation and was induced by it to engage in certain conduct; and (5) suffered pecuniary loss as a result of such reliance and action. Ithaca Capital Investments I S.A. v. Trump Panama Hotel Mgmt. LLC, 450 F. Supp. 3d 358, 369 (S.D.N.Y. 2020). A common law fraud claim cannot be brought alongside a breach of contract claim that arises from the same underlying facts unless the fraud claim (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) demonstrates a misrepresentation "collateral or extraneous" to the contract; or (3) seeks special damages that are unrecoverable as contract damages. *Id.*

Here, Plaintiff's fraud claim arises from the same facts as her breach of contract claim: that Defendant entered into a contract with Plaintiff with a promise to pay her a sum certain for work performed. Plaintiff's breach of contract claim alleges that Defendant promised to pay her $500 per day for her work, and Defendant breached the contract by failing to pay her. Plaintiff's fraud claim alleges [*36] that Defendant promised he would pay her for her work and never intended to pay her, thereby inducing her to work for free. These claims are identical, and Plaintiff fails to plead a separate legal duty, a misrepresentation collateral or extraneous to the employment agreement, or special damages unrecoverable by contract.

Accordingly, I find Plaintiff's fraud claim as duplicative of her breach of contract claim, and thus it should be dismissed.

### C. Damages

---

19 For reasons unknown to the Court, Plaintiff appears to have, in her inquest briefing, artificially limited their breach of contract claim for unpaid wages to just services performed between April 1, 2016, and April 8, 2016. (See ECF 130 ¶¶ 123-129) ("Defendant breached the agreement because he failed to pay Plaintiff $500 per day for her work. In doing so, Plaintiff was damaged in the amount of $3,500.00 and Defendant Townes is liable for this damage."). (See also ECF 129 at 25, 27) ("Accordingly, Plaintiff is entitled to breach of contract damages of $33,400 for relocation costs and $3,500 for daily rates between April 1, 2016, and April 8, 2016."). As narrowed by her submissions, Plaintiff's breach of contract claim does not include failure to pay wages above minimum wage for any time worked after April 8, 2018, and the Court thus presumes that Plaintiff is waiving any such claims.

20 The Court notes that Plaintiff's breach of contract claims for failure to pay wages are not preempted by the FLSA, as her breach of contract claim relates to wages that ought to be paid in excess of Plaintiff's minimum wage claims. See Contrera v. Langer, 314 F. Supp. 3d 562, 571 (S.D.N.Y. 2018) (holding the FLSA does not preempt a breach of contract claim for time worked to the extent the promised rate is higher than the minimum wage).

The Court must determine whether Plaintiff has provided sufficient evidence to support her claimed damages. *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997); Nguyen, 2025 WL 564546 at *12. Damages are proven through an evidentiary hearing, or through affidavits and other documentary submissions that provide a factual basis for determining the amount of damages to be awarded. Greyhound, 973 F.2d at 158.

After Judge Carter entered default judgment against Defendant, (ECF 117), I ordered Plaintiff to file (1) proposed findings of fact and conclusions of law and (2) an inquest memorandum setting forth proof of damages, supported by documentary evidence and/or one or more affidavits establishing any proposed figures. (ECF 120). On August 10, 2023, Plaintiff filed her proposed findings of fact and conclusions of law and inquest memorandum, **[*37]** (ECF Nos. 129, 130), as well as: (1) a declaration of Plaintiff's counsel, Danilo Bandovic, (ECF 131); (2) an affidavit of Plaintiff, (ECF 131-1); (3) affidavits of Dr. Adrienne Denise, Mitzi Perdue, Melissa Goodman, Leslie Vail, David Mason, Ferris Eanfar, and Ellen Boudreaux (ECF Nos. 131-2-7, 131-10); (4) a copy of Plaintiff's domestic incident report, (ECF 131-8); (5) Plaintiff's time sheets, (ECF 131-9); and (6) additional exhibits in support. (ECF 131-11-19). Because Plaintiff's submissions constitute a sufficient basis from which to evaluate the fairness of the requested damages, an in-person hearing in not necessary, *see* Nguyen, 2025 WL 564546 at *12 (citing Fustok v. ContiCommodity Servs. Inc., 873 F.2d 38, 40 (2d Cir. 1989)), and the Court will assess damages below.

### *1. Compensatory Damages (Discrimination; VGMVPA, IIED)*

Plaintiff seeks compensatory damages of at least $10,000,000 for, among other things, Defendant's (1) unlawful discrimination in violation of NYSHRL § 296 and NYCHRL § 8-107(1); (2) violation of the VGMVPA; and (3) intentional infliction of emotional distress. (*See* ECF 129 at 13-16).

"Title VII, NYSHRL, and NYCHRL entitle a plaintiff to compensatory damages for pecuniary loss as well as pain and suffering. Although Title VII limits the amount of damages that may be awarded, the NYSHRL **[*38]** and NYCHRL do not." Williams v. Firequench, Inc., 21-CV-4112 (PAE) (JLC), 2022 U.S. Dist. LEXIS 148682, 2022 WL 3571752, at *3 (S.D.N.Y. Aug. 19, 2022) (quoting *Gutierrez v. Taxi Club Mgmt., Inc.*, 19-CV-532 (AMD) (VMS), 2018 WL 3432786, at *6 (E.D.N.Y. June 25, 2018)). Courts have also awarded compensatory damages for claims under the VGMVPA. *See* Cartright v. Lodge, 15-CV-9939 (KMW) (RLE), 2017 U.S. Dist. LEXIS 48052, 2017 WL 1194241, at *6 (S.D.N.Y. Mar. 30, 2017) (awarding emotional distress damages for claims brought under the VGMVPA).

Courts recognize three categories of emotional distress claims: (1) garden-variety emotional distress claims, where a plaintiff describes their distress in conclusory terms; (2) significant or substantial emotional distress claims, where a plaintiff provides evidence through medical testimony or documentation; and (3) egregious emotional distress claims, where a defendant's conduct was so "outrageous and shocking or where the physical health of the plaintiff was significantly affected." *See* Chen v. Shanghai Café Deluxe, Inc., 17-CV-2536 (VF), 2023 U.S. Dist. LEXIS 50776, 2023 WL 2625791, at *8 (S.D.N.Y. Mar. 24, 2023). Courts typically award $5,000 to $35,000 for garden-variety emotional distress claims and $50,000 to $100,000, for significant or substantial emotional distress claims. Manson v. Friedberg, 08-CV-3890 (RO), 2013 U.S. Dist. LEXIS 83488, 2013 WL 2896971, at *7 (S.D.N.Y. June 13, 2013).

"As the Supreme Court has noted, the crime of sexual assault is inherently violent in nature and, even if not accompanied by violence, may inflict serious psychological damage on the victim." Doe v. Hyassat, 18-CV-6110 (PGG) (OTW), 2024 U.S. Dist. LEXIS 67482, 2024 WL 2862547, at *4 (S.D.N.Y. Apr. 11, 2024), *report and recommendation adopted*, 2024 U.S. Dist. LEXIS 81448, 2024 WL 1955354 (S.D.N.Y. May 3, 2024). Courts in this district have "upheld large compensatory damage awards for sexual assault and rape victims." *Id.* Damages **[*39]** awards in similar cases "provide an objective frame of reference" but are not controlling. *Id.*

Plaintiff has provided significant evidentiary support for the damage awards that she seeks. Plaintiff's own affidavit details the lasting mental and emotional damage that Defendant's behavior caused, including PTSD, panic attacks, depression, and severe disruption to her personal and social life. (*See* ECF 131-1 ¶¶ 71, 82, 83, 89-91). Plaintiff's claims are supported by multiple affidavits of medical professionals, as well as close friends. (ECF 131-2-8).

While Plaintiff seeks an award of $10,000,000, none of

the cases she provides in support exceeded an award of $2,000,000 for either discrimination or emotional distress related to sexual assault. (ECF 129) (citing cases with awards ranging between $400,000 and $2,000,000). The case cited by Plaintiff with facts closest to those as pled here is *Noonan v. Becker*, where Judge Cott recommended $1,000,000 in compensatory damages for a sexual assault victim who provided evidence for "severe emotional distress, including paranoia, fear, embarrassment, trouble focusing at work, PTSD, depression, and anxiety." 14-CV-4084 (LTS) (JLC), 2018 U.S. Dist. LEXIS 60704, 2018 WL 1738746, at *5 (S.D.N.Y. Apr. 10, 2018). Other cases where the plaintiff was **[*40]** drugged, raped, and sexually assaulted have yielded awards of somewhere between $1,000,000 and $2,500,000. *See Hyassat*, 2024 U.S. Dist. LEXIS 81448, 2024 WL 1955354, at *6 (awarding $1,250,000 in compensatory damages); *see also Doe v. HRH Prince Abdulaziz Bin Fahd Alsaud*, 2017 U.S. Dist. LEXIS 167359, 2017 WL 4541426, at *7 (S.D.N.Y. Oct. 10, 2017) (awarding $1,250,000 in compensatory damages); *see also Doe v. United States*, 2018 U.S. Dist. LEXIS 89980, 2018 WL 2431774, at *9 (D. Ariz. May 30, 2018) (awarding $2,500,000 in compensatory damages for sexual assault).

Having reviewed comparable cases and the evidence presented, I find that an award of $750,000 in compensatory damages is "fair and reasonable compensation in light of the evidence." *Noonan*, 2018 U.S. Dist. LEXIS 60704, 2018 WL 1738746, at *7.

**2. Punitive Damages (Discrimination; VGMVPA, IIED)**

Plaintiff also seeks $10,000,000 in punitive damages.

Punitive damages are available "where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him." *Walker v. Sheldon*, 10 N.Y.2d 401, 404, 179 N.E.2d 497, 223 N.Y.S.2d 488 (1961) (internal citation and quotations omitted). An award of punitive damages must be "fair, reasonable, predictable, and proportionate" considering: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between the award and the penalties authorized or imposed in comparable cases. *Hyassat*, 2024 U.S. Dist. LEXIS 67482, 2024 WL 2862547, at *5. Courts often employ a one-to-one ratio of punitive damages to compensatory **[*41]** damages where the compensatory damages are "substantial." *Id.*

The two cases in this district that Plaintiff cites in support awarded the plaintiff $1,000,000 in punitive damages for a sexual assault with life-long ramifications for the victim. *See Noonan*, 2018 U.S. Dist. LEXIS 60704, 2018 WL 1738746, at *8 (awarding $1,000,000 in punitive damages); *HRH Prince Abdulaziz*, 2017 WL 4541426, at *7 (awarding $1,000,000 in punitive damages).

As detailed above, Defendant's conduct was malicious and morally reprehensible. Given my review of comparable cases, I find that an award of $750,000 in punitive damages is appropriate here.

**3. Unpaid Minimum Wage and Overtime Damages**

The NYLL requires that employers pay their employees a minimum wage for each hour worked. 29 U.S.C. § 206(a); N.Y. Lab. Law § 652-1. Large employers in New York City, those with eleven or more employees, followed a minimum wage schedule different from that of small employers. N.Y. Lab. Law § 652-1(a)(1).

A starting point in assessing a plaintiff's damage award begins with their regular rate of pay. *Chen v. L & H Wine & Liquor, Inc.*, 19-CV-6115 (PGG), 2024 U.S. Dist. LEXIS 80715, 2024 WL 1932855, at *6 (S.D.N.Y. May 2, 2024).[21] Under the NYLL, employees must also be paid one-and-one-half times their regular hourly rate for any work performed in excess of a forty-hour work week. N.Y.C.R.R. § 146-1.4. "The Court must next calculate the weekly pay that Plaintiff should have received under the NYLL." *L & H Wine & Liquor*, 2024 U.S. Dist. LEXIS 80715, 2024 WL 1932855, at *9 (S.D.N.Y. May 2, 2024).

Plaintiff's calculated regular rate of pay **[*42]** between April 1, 2016, and May 8, 2016, is summarized as follows:

Go to table3

Because Plaintiff's calculated regular rate of pay was greater than the prevailing minimum wage during this time period, there are no recoverable damages under

---

21 When an employer has not assumed their responsibility of maintaining "accurate records of an employee's wages and hours, the plaintiff employee need only offer evidence permitting a reasonable inference as to" those figures. L & H Wine & Liquor, 2024 U.S. Dist. LEXIS 80715, 2024 WL 1932855, at *6 (S.D.N.Y. May 2, 2024).

NYLL. However, Plaintiff continued to work for Defendant from May 9, 2016, until March 5, 2018, and was not paid for any of her work during this time period. The minimum wage during the relevant time periods is summarized as follows:

[Go to table4]

Accordingly, Plaintiff's calculated regular rate of pay of $0 was below the New York's minimum wage for the period between May 9, 2016, and March 5, 2018, and Plaintiff's regular rate of pay is to be calculated at the applicable minimum wage rate for each pay period.[22]

The overtime rate of pay for the relevant time periods is summarized as follows:

[Go to table5]

Plaintiff's inquest submissions only provided time sheet entries with simple daily and weekly totals, which vary significantly in the total number of hours worked, and a total sum of hours worked across the entire 2-year period. (See ECF 131-9). Because it is not incumbent on the Court to calculate what Plaintiff should have been paid on an individual per-pay-period basis (which Plaintiff's counsel should have done in their inquest submissions), in order to calculate Plaintiff's lawful pay—e.g., what Plaintiff would have earned in a 40-hour work week at her regular rate of pay plus payment at Plaintiff's calculated overtime rate of pay for hours worked over 40—the Court summed the total number of "regular" hours worked (e.g., up to 40 hours) and the total number of overtime hours worked for each applicable year, (e.g., the total number of "regular" and overtime hours worked in 2016, 2017, and 2018), to calculate Plaintiff's lawful pay on an annualized basis, which is summarized as follows:

[Go to table6]

As Plaintiff was not paid at all during the relevant time periods, Plaintiff's aggregate underpayment is $55,742.77.

Accordingly, I recommend that Plaintiff be awarded **$55,742.77** in unpaid minimum wage and overtime damages.[24]

### 4. Breach of Contract

"Under New York Law, a successful plaintiff in a breach of contract action is entitled to damages in the amount necessary to put the plaintiff in the same economic position [s]he would have been in had the defendant fulfilled his contract." *Am. Jewish Comm. v. Berman*, 15-CV-5983 (LAK) (JLC), 2016 WL 3365313, at *5 (S.D.N.Y. June 15, 2016). "Where damages are susceptible to simple mathematical calculation and the plaintiff provides a 'sufficient basis from which to evaluate the fairness' of the requested damages, no evidentiary hearing is necessary." *Euro Pac. Capital, Inc. v. Bohai Pharms. Group, Inc.*, 15-CV-4410 (VM) (JLC), 2018 U.S. Dist. LEXIS 39135, 2018 WL 1229842, at *4 (S.D.N.Y. Mar. 9, 2018).

As discussed above, Plaintiff's inquest briefing only seeks damages for work performed under the contract between April 1, 2016, and April 8, 2016. (See ECF Nos. 129 at 24-25; 130 ¶¶ 123-129). Also as discussed above, Defendant paid Plaintiff a single lump sum of $5,833.09 for her hours worked between April 9, **[*45]** 2016, and May 5, 2016. Using the Court's assumptions above, presumably $448.70 of Defendant's $5,833.09 lump sum payment applied to work performed between April 1 and April 8, 2016. Thus, subtracting $448.70 from $5,833.09, Plaintiff is owed $5,384.39 under the contract.

Accordingly, to put Plaintiff in the same economic position she would have been in if Defendant had fulfilled the contract, Plaintiff is entitled to damages in the amount of **$5,384.39**.

### 5. Post-Judgment Interest

---

22  In the complaint, Plaintiff's 12th cause of action alleges that by failing to pay Plaintiff, Defendant violated NYLL § 652 by "fail[ing] to pay at least minimum wage compensation to Plaintiff." (ECF 65 ¶ 301) ("Plaintiff is entitled to her unpaid minimum wages as a consequence of the Defendant TOWNES' unlawful actions and omissions..."). NYLL § 652 specifically sets out that workers are entitled to minimum wage. In their inquest briefing, Plaintiff now seeks recovery of all unpaid wages at a rate of $62.50 per hour (and thus, overtime wages at a rate of $93.75 per hour). Because this claim was not pleaded in Plaintiff's complaint, the Court declines to calculate Plaintiff's unpaid wages as more than the minimum wage set out by New York statute. See Campbell, 2012 WL 2952852 at *15.

24  While the NYLL allows plaintiffs to collect pre-judgment interest on compensatory damages, Plaintiff did not expressly seek pre-judgment interest in the Complaint. (See ECF 65). Because default judgment shall not differ in kind from that prayed from in the complaint, and "prejudgment interest is not implied by a generic request for such other and further relief which this Court deems just and proper," RLI Ins. Co. v. King Sha Group, 598 F. Supp. 2d 438, 446 (S.D.N.Y. 2009), Plaintiff is "precluded from recovering a default judgment award for pre-judgment interest," Pauta v. Aena Mech. Corp., 11-CV-6374 (WHP), 2014 U.S. Dist. LEXIS 108683, 2014 WL 3855025, at *3 (S.D.N.Y. July 25, 2014).

Plaintiff is entitled to post-judgment interest calculated from the date of entry of the judgment, to the date the judgment is paid, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. 28 U.S.C. § 1961(a).

### 6. Costs[25]

Plaintiff also seeks recovery of $965.90 for costs associated with litigating this action. (ECF 129 at 26). "Where an attorney fails to provide suitable documentation to substantiate the costs incurred, a court may decline to award costs." See Zimmerman v. Portfolio Recovery Assocs., LLC, 09-CV-4602 (PGG), 2013 U.S. Dist. LEXIS 174182, 2013 WL 6508813, at *13 (S.D.N.Y. Dec. 12, 2013). Because Plaintiff declined to provide any evidence of the costs for which they seek reimbursement, the Court will take judicial **[*46]** notice of the $400 filing fee, as reflected on the docket, (ECF 1), but will deny any additional costs. Mango v. BuzzFeed, Inc., 356 F. Supp. 3d 368, 378 (S.D.N.Y. 2019).

Accordingly, I recommend a total award of costs in the amount of **$400**.

### IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that Defendant be held jointly and severally liable to Plaintiff for the following:
- $750,000 in compensatory damages for discrimination, IIED, and violations of the VGMPA.
- $750,000 in punitive damages for discrimination, IIED, and violations of the VGMPA.
- $55,742.77 in unpaid minimum wage and overtime damages; and
- $5,384.39 in compensatory damages for breach of contract.

This totals to **$1,561,127.16** in total damages. I also recommend that Plaintiff be awarded post-judgment interest calculated in accordance with 28 U.S.C. § 1961(a); and costs in the amount of **$400**.

### V. OBJECTIONS

In accordance with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. See also Fed. R. Civ. P. 6. A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to the Honorable Andrew L. Carter, Jr., United States District Judge. **[*47]** Any requests for an extension of time for filing objections must be directed to Judge Carter.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW**. See Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 58 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Respectfully submitted,

Dated: September 17, 2025

New York, New York

/s/ Ona T. Wang

**Ona T. Wang**

United States Magistrate Judge

---

[25] Plaintiff does not seek attorney's fees and did not file any attorney billing records.

**Table1 (**Return to related document text**)**

| Pay Period | Days to Which the Lump Sum Payment "Applies" | Total Paid for Each Pay Period |
|---|---|---|
| 4/1/2016 - 4/10/2016 | 2 | $448.70 |
| 4/11/2016 - 4/17/2016 | 7 | $1570.45 |
| 4/18/2016 - 4/24/2016 | 7 | $1570.45 |
| 4/25/2016 - 5/1/2016 | 6 | $1346.10 |
| 5/2/2016 - 5/8/2016 | 4 | $897.40 |

**Table1 (**Return to related document text**)**

---

**Table2 (**Return to related document text**)**

| Pay Period | Calculated Regular Rate of Pay[16] | Minimum Wage[17] |
|---|---|---|
| 4/1/2016 - 4/10/2016 | $11.22 | $9.00 |
| 4/11/2016 - 4/17/2016 | $39.26 | $9.00 |
| 4/18/2016 - 4/24/2016 | $39.26 | $9.00 |
| 4/25/2016 - 5/1/2016 [*31] | $38.84 | $9.00 |
| 5/2/2016 - 5/8/2016 | $22.44 | $9.00 |

**Table2 (**Return to related document text**)**

---

**Table3 (**Return to related document text**)**

| Pay Period | Calculated Regular Rate of Pay | Minimum Wage |
|---|---|---|
| 4/1/2016 - 4/10/2016 | $11.22 | $9.00 |
| 4/11/2016 - 4/17/2016 | $39.26 | $9.00 |
| 4/18/2016 - 4/24/2016 | $39.26 | $9.00 |
| 4/25/2016 - 5/1/2016 | $38.84 | $9.00 |
| 5/2/2016 - 5/8/2016 | $22.44 | $9.00 |

**Table3 (**Return to related document text**)**

---

**Table4 (**Return to related document text**)**

| Pay Period | Calculated Regular Rate of Pay | Minimum Wage |
|---|---|---|
| 5/9/2016 - 12/31/2016 | $0 | $9.00 |
| 1/1/2017 - 12/31/2017 | $0 | $10.50 |
| 1/1/2018 - 3/5/2018 | $0 | $12.00 |

**Table4 (**Return to related document text**)**

---

**Table5 (**Return to related document text**)**

| Pay Period | Regular Rate of [*43] Pay | Overtime Rate of Pay |
|---|---|---|
| 5/9/2016 - 12/31/2016 | $9.00 | $13.50 |

---

17  See NYLL § 652.

16  For the total hours worked per pay period, see (ECF 131-9). For the first eight days during the first pay period, Plaintiff logged her hours as "all day." (Id.). The Court presumes that Plaintiff worked 8 hours during these days. Based on Plaintiff's submissions, Plaintiff worked over 40 hours during Pay Periods 1, 2, 3, and 5, and 34.66 hours during Pay Period 4.

Case 1:25-cv-01675-VSB-VF   Document 84-1   Filed 10/01/25   Page 18 of 18

Page 18 of 18
2025 U.S. Dist. LEXIS 182883, *43

| Pay Period | Regular Rate of [*43] Pay | Overtime Rate of Pay |
|---|---|---|
| 1/1/2017 - 12/31/2017 | $10.50 | $15.75 |
| 1/1/2018 - 3/5/2018 | $12.00 | $18.00 |

**Table5 (**Return to related document text**)**

---

**Table6 (**Return to related document text**)**

| Time Period | Regular Rate [*44] of Pay | Total "Regular" Hours Worked | Total Overtime Rate of Pay | Overtime Hours Worked | Lawful Annualized Pay[23] |
|---|---|---|---|---|---|
| 5/9/2016 - 12/31/2016 | $9.00 | 1,103.83 | $13.50 | 654.67 | $18,772.52 |
| 1/1/2017 - 12/31/2017 | $10.50 | 1,712 | $15.75 | 1,042.27 | $34,391.75 |
| 1/1/2018 - 3/5/2018 | $12.00 | 213 | $18.00 | 1.25 | $2,578.50 |

**Table6 (**Return to related document text**)**

---

**End of Document**

---

23  Typically, a plaintiff's "lawful weekly pay is calculated as follows: (40 hours ☓ [regular rate of pay]) + ([Hours worked per week] - 40 hours) ☓ [overtime rate of pay])." L & H Wine & Liquor, Inc., 2024 U.S. Dist. LEXIS 80715, 2024 WL 1932855 at *9. Here, the Court calculates Plaintiff's lawful annual pay as follows: ([total "regular" hours worked] x [regular rate of pay]) + ([total overtime hours worked] x [overtime rate of pay]).